IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LOUIS J. RODRIGUEZ | ) | CV. NO. 22-00299 SOM-KJM |
| | ) | |
| Plaintiff, | ) | POST-TRIAL FINDINGS OF FACT |
| | ) | AND CONCLUSIONS OF LAW; |
| vs. | ) | ORDER DIRECTING ENTRY OF |
| | ) | JUDGMENT IN FAVOR OF |
| BRANDON D. CORNER; JOHN DOES | ) | PLAINTIFF |
| 1019; JANE DOES 1-10; DOE | ) | |
| PARTNERSHIPS 1-10; and DOE | ) | |
| GOVERNMENT ENTITIES 1-10 | ) | |
| Defendants. | ) | |
| | ) | |

**POST-TRIAL FINGINGS OF FACT AND CONCLUSIONS OF LAW;
ORDER DIRECTING JUDGMENT IN FAVOR OF PLAINTIFF**

I.          INTRODUCTION.

Plaintiff Louis K. Rodriguez, while operating a motorbike, was involved in an accident on the night of January 2, 2020, with Defendant Brandon D. Corner, who was driving a car.  Rodriguez sued Corner for negligence in state circuit court.  *See* Complaint, ECF No. 1-2, PageID # 15.  Corner removed the case to this federal district court based on diversity jurisdiction.  Notice of Removal by Def. Brandon D. Corner ("Notice of Removal"), ECF No. 1, PageID # 2-3.  As detailed in the following findings and conclusions, the court, after a one-day nonjury trial,[1] finds in favor of Rodriguez, but reduces his damage award in light of his comparative negligence.

_____

[1]  The trial proceeded in accordance with this court's nonjury trial procedures, pursuant to which direct examination is presented through written declarations, rather than through oral

II.        **JURISDICTION.**

  A.    **Subject Matter Jurisdiction.**

The court has subject matter jurisdiction in this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are diverse in citizenship. Notice of Removal, ECF No. 1, PageID # 2-3 (explaining that Rodriguez's medical bills, for which he claims damages, exceed $94,409.09); Pl.'s Second Amended Trial Declaration ("Pl.'s Decl."), ECF No. 74, Page ID # 430 (stating that Rodriguez was a Hawai'i citizen at all times material to his claim); Def.'s Decl., ECF No. 72, PageID # 411 (stating that Corner is a Canadian citizen).

"Federal courts sitting in diversity apply state substantive law and federal procedural law." *Nautilus Ins. Co. v. Builders, Inc.*, 955 F. Supp. 2d 1121, 1132 (D. Haw. 2013).

  B.    **Abolition of Tort Liability.**

Hawai'i Revised Statutes ("HRS") § 431:10C-306 abolishes tort liability for accidental harm arising from motor vehicle accidents in Hawai'i.  The statute sets forth exceptions

---

testimony in open court.  *See* Procedures for Trials Before Judge Susan Oki Mollway ¶ 15, https://www.hid.uscourts.gov/ (click on "Judge's Requirements," then on "Senior Judge Susan Oki Mollway," then on "Trial Procedures").  Under this procedure, the court rules on objections to the declarations, then hears live cross-examinations and live redirect examinations.  Some of the witnesses testified by agreement via videoconference.

to the abolition of tort liability, including when a person injured in a motor vehicle accident incurs personal injury damages that equal or exceed a statutory amount. *Id.* § 431:10C-306(b)(4). Sums paid by health insurance count toward this threshold amount. *Id.* § 431:10C-306(b)(4)(A)(iii). "Satisfaction of the tort threshold exception is a jurisdictional requirement to the filing of a lawsuit similar to the amount in controversy jurisdictional requirement in federal diversity suits." *Mobley v. Kimura*, 146 Hawai'i 311, 325 n.23, 464 P.3d 968, 982 n.23 (2020) (internal quotation and citation omitted).

Rodriguez incurred medical expenses exceeding the required amount. Even if one considered only the amount paid by Med-Quest, an insurance payer through the Hawai'i Department of Human Services, that amount ($55,861.03) exceeds the threshold amount required under HRS § 431:10C-306(b)(4). *See* Pl.'s Proposed Findings of Fact & Conclusions of Law ("Pl.'s Proposed FOF & COL"), ECF No. 81, PageID # 687-88. Thus, tort liability is not abolished in this case.

III.        **FINDINGS OF FACT.**

If any Finding of Fact is more properly construed as a Conclusion of Law, or vice versa, it should be construed as such.

### A.  Background.

In early 2019, Rodriguez purchased a Kymco K-Pipe motorbike[2] from Moped Garage in Honolulu, Oʻahu.  Pl.'s Decl., ECF No. 74, PageID # 431.  He received 45 minutes to 1 hour of training on the use of the motorbike when he bought it.  Trial Transcript, ECF No. 79, PageID # 482.  Moped Garage employees told Rodriguez that the motorbike would "top out" at 55 miles per hour.  Trial Transcript, ECF No. 79, PageID # 472.

Rodriguez drove the motorbike approximately 150 to 200 times in various traffic conditions and at various times of day without any difficulty, mechanical problem, or operational issue before the accident.  Pl.'s Decl., ECF No. 74, PageID # 431.

---

[2]  At trial, the parties discussed whether Rodriguez had a motorcycle or a moped.  *See, e.g.*, Trial Transcript, ECF No. 79, PageID # 468-70.  Different legal requirements and provisions apply depending on which category is involved.  This court need not determine whether either term is appropriate and uses the term "motorbike."  Rodriguez believed that the Kymco was a moped.  Pl.'s Decl., ECF No. 74, PageID # 431.  He had previously owned and operated a moped for "many years."  *Id.*  He did not have the endorsement required to operate a motorcycle.  Trial Transcript, ECF N. 79, PageID # 468.  However, there was no evidence that the lack of an endorsement to operate a motorcycle affected what occurred.

Shortly after December 25, 2019, Corner arrived on
Oʻahu with his cousins Jacob Churchill and Katie Churchill for a
vacation.  Trial Decl. of Passenger Witness Kathleen Elizabeth
Churchill ("Katie Churchill Decl."), ECF No. 66-2, PageID # 340;
Trial Decl. of Passenger Witness Jacob Douglas Churchill ("Jacob
Churchill Decl."), ECF No. 66-3, PageID # 343; Def.'s Decl., ECF
No. 72, PageID # 412-13.  Corner had never visited Oʻahu before.
Trial Transcript, ECF No. 79, PageID # 568.  He rented a Mini
Cooper car to drive himself and his cousins around the island.
Katie Churchill Decl., ECF No. 66-2, PageID # 340; Jacob
Churchill Decl., ECF No. 66-3, PageID # 343; Def.'s Decl., ECF
No. 72, PageID # 413.  Corner had never driven a Mini Cooper
before.  Trial Transcript, ECF No. 79, PageID # 568.

### B.   The Accident.

The accident took place on January 2, 2020, near
downtown Honolulu, at the intersection of Lusitana Steet and
Alapai Street.

Rodriguez was trying to sell his motorbike and met a
prospective buyer in a Costco parking lot in Iwilei, Oʻahu,
around 4:30 p.m. that day.  Pl.'s Decl., ECF No. 74, PageID
# 432.  While the prospective buyer test-drove the motorbike,
Rodriguez noted that its twin headlights, which automatically
turned on when the motorbike was started, were operational.  *Id.*

When the prospective buyer decided not to buy the motorbike, Rodriguez left Costco to drive home. *Id.* He drove onto Dillingham Boulevard, turned right onto Liliha Street, and eventually turned right again onto Vineyard Boulevard. From Vineyard, he took the Lusitana Street exit, heading eastbound. *Id.* at PageID # 433.

Rodriguez had taken this route while driving his Honda Accord sedan from his home to Costco and back, but he had never before driven his motorbike all the way home from Costco. Trial Transcript, ECF No. 79, PageID # 468, 492. However, he had driven his motorbike on the segment from Vineyard Boulevard to Lusitana Street and then home "a few times" before. *Id.* at PageID # 492-93.

It was dusk when Rodriguez reached Lusitana Street on his motorbike. Pl.'s Decl., ECF No. 74, PageID # 433. Lusitana Street is a divided two-lane surface road with eastbound and westbound lanes. *Id.* The speed limit on Lusitana Street is 25 miles per hour. *Id.*

Rodriguez drove down Lusitana Steet at 25 to 40 miles per hour. He described slowing from "between 30 and 40" miles per hour "to 25 miles per hour" after taking the Lusitana Street exit off of Vineyard Boulevard. Pl.'s Decl., ECF No. 74, PageID # 433; Trial Transcript, ECF No. 79, PageID # 491. However, a report from the emergency medical services ("EMS") team that

6

responded to the accident, as well as records from the emergency
and orthopedic surgery departments at The Queen's Medical Center
in Honolulu made shortly after the accident, state that
Rodriguez reported his speed as approximately 40 miles per hour
before the accident.  Joint Ex. 2 at 3 (emergency department
report); Joint Ex. 3 at 4 (orthopedic surgery notes); Joint Ex.
27 at 2 (EMS report).  This court questions the reliability of
Rodriguez's statement during trial that he slowed to 25 miles
per hour.  The accident report, EMS report, and medical notes
refer to his own statement on the day of the accident that he
was traveling approximately 40 miles per hour.  His Proposed
Findings of Fact recognize that "there is circumstantial
evidence that Plaintiff may have been exceeding the speed limit
on Lusitana Street."  Pl.'s Proposed FOF & COL, ECF No. 81,
PageID # 702.

    Rodriguez's expert Wayne M. Slagle, P.E., testified
that the speed at which Rodriguez traveled "cannot be
determined."  Trial Decl. of Wayne M. Slagle, P.E. ("Slagle
Decl."), ECF No. 64, PageID # 314.  Corner's expert Brad M.
Wong, P.E., testified that the "physical evidence is
inconclusive" as to whether Rodriguez was traveling "25 mph or
40 mph (or somewhere in between)."  Trial Decl. of Forensic
Accident Reconstruction and Human Factors Expert Brad M. Wong
("Wong Decl."), ECF No. 67-1, PageID # 364.  This court finds

that, according to the more credible evidence, Rodriguez was traveling up to 15 miles per hour over the posted speed limit on Lusitana Street.

As Rodriguez traveled eastbound on Lusitana Street, Corner traveled westbound on the same street, heading toward Rodriguez. Def.'s Decl., ECF No. 72, PageID # 411. Corner had never driven on Lusitana Street before. Trial Transcript, ECF No. 79, PageID # 573. He could not say how fast he was traveling on Lusitana Street. *Id.* at PageID # 580.

Corner said he was "getting direction from [his] cousin's cell phone because [he] had not bought a data plan with [his] Canadian cell phone provider." Def.'s Decl., ECF No. 72, PageID # 413; Trial Transcript, ECF No. 79, PageID # 574. Corner could not recall which cousin owned the phone that was providing directions. Trial Transcript, ECF No. 79, PageID # 574. Katie Churchill, one of Corner's cousins, testified that she had her cell phone with her in the car and that its data plan allowed use outside of Canada. Katie Churchill Decl., ECF No. 66-2, PageID # 340. She recalled that, before the accident, she "was sitting in the back passenger seat and texting with friends some of the time." *Id.* She neither confirmed nor denied having provided directions to Corner. *See id.* Jacob Churchill, Corner's other cousin, testified that he did not provide directions before the accident. Trial Transcript, ECF

No. 79, PageID # 542.  In any event, Corner says he thought he needed to turn left from Lusitana Street onto Alapai Street to get where he wanted to go.  *Id.* at PageID # 572-73.

Corner testified that he activated his left turn signal before he reached the Lusitana-Alapai intersection, but he did not explain exactly when he turned it on.  *See* Def.'s Decl., ECF No. 72, PageID # 413.

Before he turned left onto Alapai Street, Corner saw "two headlights in the distance" in the eastbound lane on Lusitana Street heading toward the Lusitana-Alapai intersection. Trial Transcript, ECF No. 79, PageID # 575.  There is no evidence that there were any vehicles besides those driven by Rodriguez and Corner on Lusitana Street at the time.  Def.'s Decl., ECF No. 72, PageID # 413 ("When I was on Lusitana Street in the area of where the incident involving Mr. Rodriguez occurred, there wasn't too much traffic at all, and I didn't really see any other cars there before the incident."); Pl.'s Decl., ECF No. 74, PageID # 433 ("When I reached Lusitana Street traffic conditions were light."); Joint Ex. 23 at 1 (accident report recording the "Traffic Level" as "Light").  It appears that the headlights Corner saw were the twin headlights on Rodriguez's motorbike.

Corner provided conflicting statements as to the distance between his car and the motorbike's headlights.  In his

9

deposition, he stated that the headlights were 10 car lengths away.  Trial Transcript, ECF No. 79, PageID # 577.  He made no corrections after reviewing his deposition transcript.  *Id.* at PageID # 577-78.  In his trial declaration, he first stated that the headlights were approximately 10 car lengths away from his vehicle as it entered the Lusitana-Alapai intersection.  Def.'s Decl., ECF No. 72, Page ID # 413.  Later in the same trial declaration, however, he stated that the headlights were near the intersection of Lusitana Street and Lisbon Street which, Corner said, was approximately 500 feet from the Lusitana-Alapai intersection.  *Id.* at Page ID # 417.

At trial, when cross-examined on whether the headlights "were approximately 10 car lengths away," Corner responded, "Approximately."  Trial Transcript, ECF No. 79, PageID # 575.  Asked about the estimate of 500 feet in his trial declaration, Corner responded, "Again, it was an approximate estimation.  To say where the headlights were, it seemed like that was a reasonable -- reasonable estimate."  *Id.*

This court recognizes that distances may be difficult to approximate.  But even a very generous length of 10 feet per car would yield 50 car lengths with a distance of 500 feet.  This would be close to the length of two football fields or 50 10-foot car lengths, five times the 10 car lengths Corner at one point estimated.  This disparity is significant enough to cause

this court to question the farther distance he offered at trial when his memory was likely dimmer.

According to Corner, he believed he had sufficient time to make the left turn given his distance from the headlights.  Def.'s Decl., ECF No. 72, PageID # 418.  He stated that it would have taken him no more than 3 seconds to complete the turn.  *Id.* at PageID # 417.  His estimation is supported by his expert's testimony that it would take approximately 3 seconds for a Mini Cooper "to turn and clear the eastbound lane of Lusitana Street."  Wong Decl., ECF No. 67-1, PageID # 364.  Had Corner seen the headlights 500 yards away, Corner would presumably have safely completed his turn in 3 seconds without affecting Rodriguez at all.

Corner did not know the speed of his car as he turned left onto Alapai Street.  Trial Transcript, ECF No. 79, PageID # 580.  However, he did not come to a "complete stop" before turning left.  *Id.*

Rodriguez said that Corner's car was approaching the Lusitana-Alapai intersection just as he was "about to enter" that intersection.  Pl.'s Decl., ECF No. 74, PageID # 434.  Rodriguez described Corner as having "made a sudden left turn" from the westbound lane of Lusitana onto Alapai Street, crossing Rodriguez's straight-line path of travel when Corner was about 10 feet from him.  *Id.*; Trial Transcript, ECF No. 79, PageID

11

# 504.  "To avoid a direct collision," Rodriguez says, he turned his "handlebars to the left away from the direction of [] Corner's car, simultaneously activating [his] hand brakes." Pl.'s Decl., ECF No. 74, PageID # 434.  According to Rodriguez, while turning his handlebars to the left, he felt "as if the right handlebar clipped [] Corner's car."  *Id.*  Rodriguez says he was then "thrust forward" and flipped over the handlebars. *Id.*  He eventually landed in the roadway, striking his right wrist, helmet, and left collarbone.  *Id.*  He ended up in the westbound lane of Lusitana Street, and his motorbike landed on top of his legs.  *Id.* at PageID # 434-35.

Corner has a different, but not entirely contradictory, recollection of what happened.  He testified that, as he completed his left turn onto Alapai Street, he saw Rodriguez "in [his] rearview mirror going by" right after his cousin Jacob "had said something in the car that there was something going on."  Def.'s Decl., ECF No. 72, PageID # 414. Although Corner believed that he had completed the turn, he conceded that the end of his car might have "partly still been in the intersection" when he saw Rodriguez in his rearview mirror.  *Id.*

Jacob, sitting in the front passenger seat of the Mini Cooper, testified that, when the car was "almost completely through the turn (meaning that [they] had crossed the opposite

12

oncoming lane but were still leaving the bicycle lane)," he "heard a squeal (similar to what [he] would expect tires screeching on the roadway to sound like) out the passenger window."  Jacob Churchill Decl., ECF No. 66-3, PageID # 344.  He turned to the right and saw "the motorcycle screeching to a halt" and then "one to two seconds later" he saw "the motorcyclist flip over the handlebars."  *Id.* at PageID # 344-45.  He then said out loud in the car "something along the lines that the guy, referring to the motorcycle operator, flipped over." *Id.* at PageID # 347.

Katie, Corner's other cousin, was sitting in the back seat of the Mini Cooper.  She had no recollection of the accident itself.  She testified that she was "looking at [her] cell phone" when Corner turned left, and, when Corner pulled over, she "did not know why [they] were stopping."  Katie Churchill Decl., ECF No. 66-2, PageID # 340.

Corner and both his cousins testified that they did not see, hear, or feel any impact of the motorbike with their Mini Cooper.  Def.'s Decl., ECF No. 72, PageID # 414; Jacob Churchill Decl., ECF No. 66-3, PageID # 347; Katie Churchill Decl., ECF No. 66-2, PageID # 340-41.  However, Rodriguez's expert Wayne M. Slagle, P.E., a mechanical engineer whose work includes motor vehicle accident reconstruction, opined that "any impact" between the motorbike and the Mini Cooper would have

been a "glancing impact which would transfer very little force to the Mini Cooper."  Slagle Decl., ECF No. 64, PageID # 313.

Slagle also explained that "very little force" to the outside of the right handlebar of the motorbike would "steer it drastically to the right while an avoidance maneuver would be a steer to the left, if given enough time to react."  *Id*.  A "sudden forced steer" of the motorbike toward the right would "cause the tire and wheel to resist forward movement and cause the rider to go over the handlebars," as described by Jacob Churchill and Rodriguez.  *Id*.; Jacob Churchill Decl., ECF No. 66-3, PageID # 344-45; Pl.'s Decl., ECF No. 74, PageID # 434. The "sudden forced steer" would pitch the motorbike "to the left and cause damage to the left side," which Slagle opined was consistent with the damage noted on the motorbike.  Slagle Decl., ECF No. 64, PageID # 314.

### C.    Post-Accident Events.

After the accident, Rodriguez crawled to the curb of Lusitana Street and stayed there because he was in severe pain. Pl.'s Decl., ECF No. 74, PageID # 436.

Corner continued to drive down Alapai Street but returned to the scene a few minutes later.  Def.'s Decl., ECF No. 72, PageID # 414; Pl.'s Decl., ECF No. 74, PageID # 436; *see* Jacob Churchill Decl., ECF No. 66-3, PageID # 347.  He testified that he returned to the scene of the accident even though he did

14

not believe there had been a collision because he "had seen someone behind [him] when [his] cousin said something."  Def.'s Decl., ECF No. 72, PageID # 414.

Both Rodriguez and Corner agree that Corner spoke to Rodriguez after returning to the scene.  However, the parties differ as to the timing of the conversation and its content. *See* Pl.'s Decl., ECF No. 74, PageID # 436; Def.'s Decl., ECF No. 72, PageID # 415; Trial Transcript, ECF No. 79, PageID # 583.

According to Rodriguez, Corner came over to him after the police arrived but before the ambulance reached the scene. Rodriguez recalled that Corner said that "he was sorry" and "placed about $80.00 in cash" in Rodriguez's backpack.  Pl.'s Decl., ECF No. 74, PageID # 436.

By contrast, Corner recalls speaking to Rodriguez after the ambulance had arrived.  *See* Def.'s Decl., ECF No. 72, PageID # 415.  He testified that he asked Rodriguez if he was okay.  *Id*.  He stated that he was "not sure" whether he apologized.  Trial Transcript, ECF No. 79, PageID # 583.  He explained that it was customary in Canada to express compassion for someone who is injured by apologizing, even if one was not at fault for causing an injury.  *Id*. at PageID # 587.  He also explained that he put money in Rodriguez's bag because, having heard Rodriguez tell the EMS team that he did not want to take

an ambulance to the hospital, Corner wanted to give him money for a taxi.[3]  Def.'s Decl., ECF No. 72, PageID # 415.

When the police arrived at the scene, officers did not question Rodriguez about what had happened.  Pl.'s Decl., ECF No. 74, PageID # 437.  Both sides agree that responding police officers spoke with Corner.  Def.'s Decl., ECF No. 72, PageID # 415; Pl.'s Decl., ECF No. 74, PageID # 436.  Jacob testified that the officers asked him for his recollection of events and that he believed they also interviewed Corner.  Jacob Churchill Decl., ECF No. 66-3, PageID # 347.

Rodriguez testified that he overheard Corner tell an officer that the car had collided with Rodriguez.  Pl.'s Decl., ECF No. 74, PageID # 436.  Corner does not specifically deny this.  *See* Def.'s Decl., ECF No. 72.  Corner stated that when he and an officer looked at the Mini Cooper, he saw no damage.  *Id.* at PageID # 415.  The accident report reports neither damage to the Mini Cooper nor a collision.  *See* Trial Decl. of Honolulu Police Officer Timothy Massie ("Massie Decl."), ECF No. 66-1, PageID # 334, 336.

Honolulu Police Officer Timothy Massie was one of the officers who arrived at the accident scene, and he completed the

---

[3]  Rodriguez explained that he declined EMS transport because his wife and uncle had arrived to take him to the hospital, which was only about 200 feet away from the scene of the accident. Trial Transcript, ECF No. 79, PageID # 508.

accident report. *Id.* at PageID # 325-36.  He acknowledged in his trial declaration that he had no "specific, independent recollection" of the accident, but had he observed any evidence of a collision, he would have coded the relevant section of the accident report differently. *Id.* at PageID # 325, 327.

Officer Massie indicated in his report that he thought Rodriguez had fallen or jumped from the motorbike. *Id.* at PageID # 332.  In the "Reason for the Maneuver" column, Officer Massie checked to "Avoid Other Vehicle." *Id.*  Officer Massie also noted that Rodriguez's vision was obstructed because of a "Moving Vehicle." *Id.*  In the "Human Factors" column, Office Massie marked "Misjudgment." *Id.*  In the "Other Factors" column, he noted that Rodriguez "Swerved to Avoid Obstacle." *Id.*  Notably, in that column, Officer Massie did not indicate that Rodriguez "Drove too Fast for Conditions." *Id.*  Nor did Office Massie mark "Exceed Posted Speed Limit," "Aggressive, Reckless Driving," or "Other Improper Action." *Id.*

Regarding Corner, Officer Massie noted "Inattention" in the "Human Factors" column. *Id.* at PageID # 336.  He also marked "No Improper Action" in the "Other Factors" column. *Id.*

In the "Narrative" portion of the accident report, Officer Massie wrote that Rodriguez "was traveling East bound on Lusitana Street when the witness vehicle that was traveling west bound on Lusitana Street, made a left turn onto Alapi [sic]

street." *Id.* at PageID # 333.  Rodriguez "avoided hitting the witness vehicle but did fall off of the motorcycle." *Id.*  He "had visible injuries and complained of pain." *Id.*

Officer Massie issued three nonmoving citations to Rodriguez:  driving without a valid driver's license (HRS § 286-102), no motorcycle or motor scooter liability insurance (HRS § 431:10G-102), and delinquent vehicle tax (HRS § 249-2). *Id.* at PageID # 327-38; Joint Ex. 23 at 3.  All three citations were later dismissed with prejudice by a state court.  Joint Ex. 32; Joint Ex. 33; Trial Transcript, ECF No. 79, PageID # 80-81.

At his deposition, Corner stated that, after leaving the scene, he and his cousins discussed the accident.  He stated that they were "mostly just again trying to figure out what happened.  Like, we didn't know what was going on or what was happening and what would be done about it as well.  We weren't sure what the plan was or what the future might hold, I guess." Trial Transcript, ECF No. 79, PageID # 586.  Asked at trial why he and his cousins "would be discussing what the future might hold if [they] weren't involved in the accident," Corner replied that he "had not been a part of something like that.  I didn't know what my future might entail because of such an event." *Id.*

**D.   Post-Accident Medical Care.**

After the accident, Rodriguez went to the Emergency Department at The Queen's Medical Center.  Joint Ex. 2 at 3. Dr. Reid Honda reported that Rodriguez had pain in his left shoulder and right wrist from the accident.  Joint Ex. 2 at 3-18; Trial Decl. of Reid Honda, M.D. ("Honda Decl."), ECF No. 62, PageID # 291-92.  Dr. Honda "visualized deformity" in Rodriguez's left clavicle, where Rodriguez complained of pain, as well as in Rodriguez's right wrist.  Honda Decl., ECF No. 62, PageID # 291.  Dr. Honda also saw abrasions on Rodriguez's knees, left elbow, and left shoulder.  *Id.*

In the Emergency Department, Rodriguez had several radiographic exams.  The exams showed comminuted fractures[4] of his mid-left clavicle and right distal radius, and a nondisplaced fracture of his left radial head.  *Id.* at PageID # 292; Joint Ex. 5 at 2; Joint Ex. 6 at 2-3; Joint Ex. 7 at 2-3; Joint Ex. 31 at 2-3.

Dr. Honda's impression, "to a reasonable degree of medical probability, was that Rodriguez had a displaced fracture of his left clavicle shaft, displaced fracture of the head of his right radius, and a left radial head fracture."  Honda

---

[4]  A "comminuted fracture" is a "bone fracture where the bone is fractured in several places."  Honda Decl., ECF No. 62, PageID # 292.

Decl., ECF No. 62, PageID # 292-93.  In lay terms, Rodriguez had
multiple fractures in his left collarbone, left elbow, and right
wrist.  Pl.'s Decl., ECF No. 74, PageID # 438.  Dr. Honda
concluded "to a reasonable degree of medical probability" that
these fractures, as well as the abrasions on the knees, left
elbow, and left shoulder, were caused by the accident.  Honda
Decl., ECF No. 62, PageID # 293.

Rodriguez left the Emergency Department but stayed at
The Queen's Medical Center for further care.  *Id.*  Medical staff
tried to reset the bones in his right wrist using weights.
Pl.'s Decl., ECF No. 74, PageID # 438.  This was extremely
painful.  *Id.*  The fractures in his left collarbone and right
wrist kept Rodriguez from being able to complete simple
activities in the hospital, such as feeding and cleaning
himself.  *Id.*

Further consultation for management of "bilateral
upper extremity injuries" was requested by Lorrin Lee, M.D., a
board-certified orthopedic surgery specialist.  Trial Decl. of
Lorrin S. Lee, M.D. ("Lee Decl."), ECF No. 65, PageID # 316-17.
Dr. Lee concluded to a reasonable degree of medical probability
that Rodriguez's injuries were caused by the accident.  *Id.* at
PageID # 319.  Dr. Lee recommended surgery to repair the
fractures in Rodriguez's right wrist and left clavicle; the
surgery occurred two days after the accident.  *Id.* at PageID

# 319-20.  "[C]ortical screws" and "locking pegs" were used to keep surgical plates in place over Rodriguez's right distal radius and left clavicle.  *Id.* at PageID # 320.  Dr. Lee also recommended nonsurgical treatment for the left radial head fracture in Rodriguez's left elbow.  *Id.* at PageID # 319.

Rodriguez was discharged from The Queen's Medical Center on January 5, 2020, three days after the accident.  Pl.'s Decl., ECF No. 74, PageID # 440; Joint Ex. 14 at 3.

Dr. Honda, Dr. Lee, and Dr. WeiChin Chen, an orthopedic surgeon retained as an expert witness by Rodriguez, testified to a reasonable degree of medical probability that Rodriguez's medical care at The Queen's Medical Center was reasonable, appropriate, and met the standard of medical care in Hawai'i.  Honda Decl., ECF No. 62, PageID # 293; Lee Decl., ECF No. 65, PageID # 321; Amended Trial Decl. of WeiChin Chen, M.D., for Purposes of Trial ("Chen Decl."), ECF No. 70, PageID # 440.

### E.   Ongoing Medical Issues from the Accident.

The pain in Rodriguez's right wrist and left clavicle continued, and, for three to four weeks after the accident, he could not clean himself after using the bathroom, pain disturbed his sleep, and he limited showering to avoid getting his stitches wet.  Pl.'s Decl., ECF No. 74, PageID # 440.

He became more mobile after his stitches were removed.  *Id.* at PageID # 440.  However, for about a year after the

21

accident, he struggled to lift more than 15 pounds in his right
hand, his left shoulder occasionally locked into place, and he
experienced sensitivity, soreness, and pain near his injury
sites.  *Id.*

At the time of the trial, Rodriguez was still feeling
the effects of the accident.  Pl.'s Decl., ECF No. 74, PageID
# 441-42.  He said that his shoulder frequently dislocated or
locked in place, and the screws in his collarbone irritate his
skin.  *Id.* at PageID # 441.  Scars from the surgery were
visible.  *See* Joint Exs. 20, 21, 22.  The scar on his wrist
embarrassed him because he had been asked if it was the result
of a suicide attempt.  Pl.'s Decl., ECF No. 74, PageID # 441.
He could lift only a limited amount of weight using his right
wrist, and he could not freely move his wrist in a circle.  *Id.*
He could no longer do certain exercises, such as push-ups,
because they caused pain in his right wrist.  *Id.*  He surfed
less because of his shoulder injury, and he had to change his
scuba diving technique.  *Id.* at PageID # 441-42.

**F.   Medical Expenses.**

The charges for Rodriguez's hospital services,
treatment, and care at The Queen's Medical Center from January
2, 2020, through January 5, 2020, related to the accident
totaled $92,078.09.  *See* Joint Ex. 15 at 3-7.

The charges for professional services at The Queen's Medical Center from January 2, 2020, through January 5, 2020, related to the accident totaled $879.00.  *See* Joint Ex. 16 at 2.

The charges for radiographic services provided by Radiology Associates, from January 2, 2020, through January 4, 2020, related to the accident totaled $1,716.00.  *See* Joint Ex. 17.

The charges for the anesthesia services provided by Pacific Anesthesia on January 4, 2020, totaled $2,940.00.  *See* Joint Ex. 18.

The charges for the emergency medical care provided by Dr. Honda on January 2, 2020, totaled $615.98.  *See* Joint Ex. 19.

Dr. Chen opined that all of these charges for services and treatment were reasonable and comparable to charges by other healthcare providers in the City and County of Honolulu.  Chen Decl., ECF No. 70, PageID # 403-04.

Med-Quest, provided through the Hawaiʻi Department of Human Services, paid $55,861.03 for medical care for injuries arising from the accident.  Pl.'s Proposed FOF & COL, ECF No. 81, PageID # 687-88.

Looking forward, Dr. Chen recommended an electrodiagnostic study to assess Rodriguez's right wrist for traumatic carpal tunnel syndrome because a carpal tunnel release

23

was not done during the surgical procedure.  Chen Decl., ECF No. 70, PageID # 404.  If the study confirms carpal tunnel syndrome, then hardware removal will be indicated.  *Id.*  Dr. Chen also noted that Rodriguez may require a total wrist fusion in the future because of post-traumatic radiocarpal osteoarthritis. *Id.*  Dr. Chen estimated the total future cost relating to the right wrist to be $37,944.24.  *Id.* at PageID # 405.

Regarding the left clavicle, Dr. Chen opined that Rodriguez "can benefit" from the removal of the surgical hardware.  *See id.* at PageID # 404-06.  He estimated the total future cost of the treatment of the left clavicle to be $8,698.00.  *Id.* at PageID # 406.

Dr. Chen's estimate for Rodriguez's future medical treatment is thus $46,642.24.  *See id*. at PageID # 404-06.

### G.    Immateriality of Cocaine Use.

Rodriguez admitted that he took one-to-two "bumps" of cocaine at a party in the early morning hours of January 1, 2020, the day before the accident.  Trial Transcript, ECF No. 79, PageID # 510-511.  While in the hospital on January 2, 2020, he tested presumptively positive for a cocaine metabolite. Joint Ex. 30 at 9.

While Corner did not claim that Rodriguez was impaired by cocaine at the time of the accident on January 2, 2020, he asserted that Rodriguez had lied about using drugs to the EMS

24

team shortly after the accident and that the cocaine use
affected Rodriguez's ability to tell the truth.  Trial
Transcript, ECF No. 79, PageID # 603-04.

Rodriguez's expert witness Clifford Wong, Ph.D.,
credibly testified that "cocaine was not involved at all in the
accident." *Id.* at PageID # 611.  Dr. Wong opined that the time
between the cocaine use and the accident was "much too long of a
time interval for the effects of cocaine still to be a factor in
the cause of the accident a day-and-a-half later." *Id.* at
PageID # 613.  He stated that, generally, the effects of cocaine
use last "one to five hours and then that's it." *Id.* at PageID
# 614.

Officer Massie's accident report indicates no
suspected impairment from drugs or alcohol on Rodriguez's part.
Massie Decl., ECF No. 66-1, PageID # 331.

The record does not support a finding that cocaine use
played any part in the accident.  Nor is there evidence that
Rodriguez's cocaine use in the early morning of January 1, 2020,
affected his ability to tell the truth on the night of the
accident, January 2, 2020.

IV.        CONCLUSIONS OF LAW.

Under Hawaiʻi law, "to prevail on a negligence claim, Rodriguez is required to prove all four of the necessary elements of negligence:  (1) duty; (2) breach of duty; (3) causation; and (4) damages."  *Cho v. Hawaiʻi*, 115 Hawaiʻi 373, 379 n.11, 168 P.3d 17, 23 n.11 (2007).  Rodriguez must prove these elements by a preponderance of evidence.

A.    Duty.

"Duty in a negligence action may be defined by common law or by statute."  *Lee v. Corregedore*, 83 Hawaiʻi 154, 172, 925 P.2d 324, 342 (1996).  In Hawaiʻi, a "duty of care may be established by statute if a legislative enactment lays down requirements of conduct and provides expressly or by implication that a violation shall entail civil liability in tort."  *Nakamoto v. Kawauchi*, 142 Hawaiʻi 259, 275, 418 P.3d 600, 616 (2018) (citations and internal quotation marks omitted); *see also Arquette v. State*, 128 Hawaiʻi 423, 443, 290 P.3d 493, 513 (2012); *Lee*, 83 Hawaiʻi at 172, 925 P.2d at 342.  In other words, "[w]hen a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard . . . from which it is negligence to deviate."  *Lee*, 83 Hawaiʻi at 172, 925 P.2d at 342

(quoting William L. Prosser, *Prosser & Keeton on the Law of Torts* § 36 at 220 (5th ed. 1984)).

In 1978, the state decriminalized traffic offenses with the passage of HRS chapter 291D, which provides for the administrative and civil adjudication of traffic infractions. *Muegge v. Wal-Mart Stores, Inc.*, No. 12-00003 SOM/KSC, 2013 WL 253531, at *4 (D. Haw. Jan. 22, 2013). HRS § 291D-3 discusses "civil liability" for traffic infractions. Violations of the state's traffic code (HRS ch. 291C) constitute traffic infractions that could incur civil liability under HRS § 291D-3.

HRS § 291C-62 requires the "driver of a vehicle intending to turn within an intersection" to "yield the right-of-way to any vehicle, bicycle, or person approaching from the opposite direction . . . when such vehicle, bicycle, or person is within the intersection or so close thereto as to constitute an immediate hazard."

Under this statute, Corner had a duty to yield the right-of-way to a vehicle approaching the Lusitana-Alapai intersection if that vehicle was "within the intersection or so close thereto as to constitute an immediate hazard." *See* HRS § 291C-62; *see also Speser v. Mondau*, No. 75724-5-I, 2017 WL 3980567, at *2 (Wash. Ct. App. Sept. 11, 2017) (concluding that a statute similar to HRS § 291C-62 imposed a duty to yield the right-of-way).

**B.   Breach.**

Rodriguez must prove by a preponderance of the evidence that Corner breached his duty to yield the right-of-way.

The parties provided no authority interpreting the meaning of the phrase "constitute an immediate hazard" in HRS § 291C-62, nor could the court find any.  Other jurisdictions, however, have examined how close an approaching vehicle has to be to constitute an immediate hazard.

For example, the Supreme Court of New Hampshire interpreted the meaning of "immediate hazard" in a statute that required drivers approaching a "stop intersection indicated by a stop sign" to stop, then to "yield the right of way to any vehicle which has entered the intersection from another highway or which is approaching *so closely* on said highway as to *constitute an immediate hazard* during the time when such driver is moving across or within the intersection."  N.H. Rev. Stat. § 265:30 (emphasis added).  The court concluded that a vehicle constituted an "immediate hazard" if it was "so close that the ordinary man of average prudence placed in the position of Corner would conclude that there was a danger of collision if he were to proceed through the intersection."  *Keeler v. Banks*, 765 A.2d 152, 154 (N.H. 2000) (internal quotations and citation

omitted) (affirming the trial judgment in favor of the defendant).

Interpreting a similar statute,[5] the Ohio Court of Appeals in *Ohio v. Ludwig*, 9th Dist. Medina No. 2531-M, 1996 WL 724778 (Ohio Ct. App. Dec. 4, 1996), held that an oncoming vehicle constituted an "immediate hazard" when its driver turned left approximately 150 feet in front of another vehicle that was forced "to brake and slow down so the situation would not be so close, so dangerous." *Id.* at *2-3.

In analyzing a close analog to HRS § 291C-62,[6] the Ohio Court of Appeals in *Ohio v. Cox*, 2d Dist. Greene No. 93-CA-63,

---

[5]  In relevant part, Ohio Rev. Code § 4511.43(A) states:

every driver . . . approaching a stop sign shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering it. After having stopped, the driver shall yield the right-of-way to any vehicle in the intersection or approaching on another roadway so closely as to constitute an immediate hazard during the time the driver is moving across or within the intersection or junction of roadways.

[6]  Ohio Rev. Code § 4511.42 provided, in the relevant part:

The operator of a vehicle * * * intending to turn left within an intersection . . . shall yield the right of way to any vehicle . . . approaching from the opposite direction, whenever the approaching vehicle . . . is within the intersection or so close to the intersection . . . as to constitute an immediate hazard.

1994 WL 21882 (Ohio Ct. App. Jan. 26, 1994), examined whether a defendant's left turn created an "immediate hazard" to an approaching sheriff's vehicle.  The sheriff's deputy testified that, when the defendant in that case turned left, "I was close enough to the intersection that I had to hit my brakes in order to insure [sic] that there was not a crash scene."  *Cox*, 1994 WL 21882, at *1.  The court rejected the argument that the distance between the left-turn driver and the oncoming vehicle was the sole factor in determining whether the oncoming vehicle constituted an immediate hazard.  *Id.* at *4.

Both *Ludwig* and *Cox* relied on *Akron v. Charley*, 440 N.E.2d 837 (Ohio Mun. Ct. 1982), in which the Akron Municipal Court concluded that "[t]here is no precise or absolute measurement to determine whether an approaching vehicle constitutes an immediate hazard."  *Id.* at 839.  Rather, the fact finder must judge each case "on its circumstances in light of common sense."  *Id.*; *see also Ohio v. Baugnet*, No. 04CA17, 2005 WL 388163 (Ohio Ct. App. Feb. 16, 2005) (reviewing *Ludwig*, *Cox*, and *Charley* and concluding that an oncoming state trooper's vehicle constituted an immediate hazard to a left-turning tractor trailer that was 1,000 feet away and driving 60 miles per hour).

This court concludes that Rodriguez was "so close" to the Lusitania-Alapai intersection that he constituted an

"immediate hazard" when Corner turned left.  *See* HRS § 291C-62.
Corner admitted that he saw two headlights coming toward him on
Lusitana Street as his vehicle approached the Lusitania-Alapai
intersection.  Def.'s Decl., ECF No. 72, PageID # 413.
According to Corner, the headlights were about 10 car lengths
away.  *Id*.  This court has found Corner's statement that
Rodriguez's headlights were 10 car lengths away more credible
than Corner's statement that the headlights may have been 500
feet away.  Corner had not yet turned left onto Alapai Street
when he saw the headlights coming toward him.  *See id*.  Even
using Corner's estimate of 10 car lengths, Rodriguez must have
been less than 10 car lengths away by the time Corner began
turning.  This is consistent with Rodriguez's testimony that
Corner "made a sudden left turn" from the westbound lane of
Lusitana onto Alapai Street when he was only about 10 feet away
from Rodriguez.  Pl.'s Decl., ECF No. 74, PageID # 434; Trial
Transcript, ECF No. 79, PageID # 504.

      Officer Massie's accident report does not attribute
fault to Corner, but the report lists "Inattention" on Corner's
part as one of the "Human Factors" contributing to the accident.
Massie Decl., ECF No. 66-1, PageID # 336.  Officer Massie did
not speak with Rodriguez about his recollection of events prior
to completing the report, so the report appears to be based on
Corner's statements.  Pl.'s Decl., ECF No. 74, PageID # 437.

Even without Officer Massie's report, the preponderance of the evidence indicates that Rodriguez was "so close" to the Lusitana-Alapai intersection that Corner's left turn created an "immediate hazard." Accordingly, the court concludes that Corner breached his duty to yield the right-of-way. *See* HRS § 291C-62.

    **C.   Causation.**

       Rodriguez must also prove the existence of a "reasonably close causal connection between the conduct and the resulting injury." *Molfino v. Yuen*, 134 Hawaiʻi 181, 184, 339 P.3d 679, 682 (2014) (quoting *Takayama v. Kaiser Found. Hosp.*, 82 Hawaiʻi 486, 499, 923 P.2d 903, 916 (1996)).

       In Hawaiʻi, it is "well-established" that an "actor's negligent conduct is the legal cause of harm to another if (a) his or her conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted in the harm." *Kahoʻohanohano v. Dep't of Human Servs.*, 117 Hawaiʻi 262, 305, 178 P.3d 538, 581 (2008) (quoting *Taylor-Rice v. State*, 91 Hawaiʻi 60, 75, 979 P.2d 1086, 1100 (1999)). This test is known as the *Mitchell* test. *See Mitchell v. Branch*, 45 Haw. 128, 132, 363 P.2d 969, 973 (1961).

       The "first arm" of the *Mitchell* test "contemplates a factual determination" that a defendant's negligence was "more

likely than not a substantial factor in bringing about the
result complained of." *Kahoʻohanohano*, 117 Hawaiʻi at 305, 178
P.3d at 582.  A "defendant's negligence need not have been the
whole cause or the only factor in bringing about the harm.  It
[is] enough that his or her negligence was a substantial factor
in causing plaintiff's injuries."  *Id.* (emphasis omitted).

      The "second arm" of the test "contemplates inquiry
where there are policy concerns or rules of law that would
prevent imposition of liability on the negligent party although
his negligence was clearly a cause of the resultant injury."
*Id*.

### 1.    Substantial Factor.

      The court concludes that Corner's left turn was a
"substantial factor" in bringing about Rodriguez's injuries.
Rodriguez testified that he was approximately 10 feet from
Corner's car when Corner turned left in front of him.  Pl.'s
Decl., ECF No. 74, PageID # 434; Trial Transcript, ECF No. 79,
PageID # 504.  Corner's turn forced Rodriguez to use the brakes
on his motorbike and turn the handlebars to the left to avoid a
direct collision.  Pl.'s Decl., ECF No. 74, PageID # 434.  This
evasive maneuver thrust Rodriguez forward and over the
handlebars of his motorbike.  *Id*.  He landed on Lusitana Street,
injuring his right wrist, left elbow, and left clavicle, and
scraping his lower extremities.  *Id.*  The evasive maneuver would

not have been necessary if Corner had not crossed Rodriguez's
path.  Corner's left turn was thus a substantial factor in
causing Rodriguez's injuries.

### 2.   Proximate Cause.

The second arm of the *Mitchell* test requires this
court to determine whether the "intervening actions" of a
plaintiff "in the chain of causation" relieves Corner from
liability.  *Taylor-Rice*, 91 Hawai'i at 76, 979 P.2d at 1102
(quoting *McKenna v. Volkswagenwerk Aktiengesellschaft*, 57 Haw.
460, 465, 558 P.2d 1018, 1022 (1977)).

Corner argues that he should not be held liable
because there was no collision between his vehicle and
Rodriguez's motorbike, and because Rodriguez's own actions were
a superseding cause of his injuries.  *See* Def.'s Proposed
Findings of Fact & Conclusions of Law ("Def.'s Proposed FOF &
COL"), ECF No. 80, PageID # 651-52.

This court turns first to the issue of collision.
This court could find no Hawai'i case requiring a physical
impact.  *See generally De Mello v. First Ins. Co.*, 55 Haw. 519,
524-29, 523 P.2d 304, 307-10 (1974) (rejecting a contractually
imposed physical impact requirement for the payment of uninsured
motorist benefits); *Leong v. Takasaki*, 55 Haw. 398, 403, 520
P.2d 758, 762 (1974) (rejecting a physical impact requirement in
a negligent infliction of emotional distress claim).  Corner

cites *Ferrage v. Honolulu Rapid Transit & Land Co.*, 24 Haw. 87, 91-92 (1917), but that case is inapt.  *Ferrage* involved the collision of an automobile and a streetcar.  *Id.* at 88.  That is, there was indeed a collision, but that case does not impose or even suggest a physical impact requirement in negligence actions.

In arguing that Rodriguez's actions were superseding causes of the accident, Corner relies on cases involving criminal acts by nonparties, a circumstance not at issue here. *Doe v. Grosvenor Properties (Hawaii) Ltd.*, 73 Haw. 158, 162, 829 P.2d 512, 514-15 (1992) (concluding that a building manager had no duty to protect an employee of a tenant of an office building from a third-party attack); *see also Houngviengkham v. Schyman*, No. CV 22-4549-GW-RAOx, 2023 U.S. Dist. LEXIS 79123, *15-17 (C.D. Cal. May 5, 2023) (describing criminal acts of nonparties as "unforeseeable superseding causes").

Although styled as a causation issue, this issue appears to be in the nature of a contributory negligence affirmative defense.  In Hawaiʻi, the concept of contributory negligence has been replaced with a comparative negligence statute, discussed in detail later in this order.  Even if the court views Corner's argument as an attack on causation, it is important to point out that it is "a rare case where the court may hold, as a matter of law, that [an] intervening act breaks

35

the chain of causation because whether it was reasonably foreseeable is a question of fact and not of law. *The second act will break the chain of causation only where, under no rational interpretation of the evidence, could the later act of negligence have been reasonably foreseen*." *Taylor-Rice*, 91 Hawai'i at 76, 979 P.2d at 1102 (quoting *McKenna*, 57 Haw. at 466, 558 P.2d at 1024) (emphasis in original); *see also McKenna*, 57 Haw. at 468, 558 P.2d at 1024 ("driving a car while under the influence of intoxicating liquor does not constitute actionable negligence or contributory negligence unless there is a causal relationship between the intoxication and the accident").

There is some evidence that Rodriguez exceeded the speed limit. But it is reasonably foreseeable that a driver would take measures such as speeding up to avoid a collision with a vehicle that was making a sudden turn. Corner testified that he saw headlights coming toward him from about 10 car lengths away as his vehicle approached the Lusitania-Alapai intersection. Def.'s Decl., ECF No. 72, PageID # 413. Other than that recollection, Corner did not testify that he saw the motorbike at all as he approached the intersection. *See id*.

This court addresses Rodriguez's alleged speeding as an issue of comparative negligence, rather than as a superseding cause that cuts off Corner's liability.

In terms of whether Rodriguez carries his burden on the elements of his negligence claim, the court concludes that Corner does not escape liability by pointing to what is essentially an affirmative defense on which Corner has the burden of proof.  Even if this court examines Corner's superseding cause argument within the context of Rodriguez's burden of proof, the result would not change.

**D.   Damages.**

Rodriguez established by a preponderance of the evidence that he sustained physical, emotional, and pecuniary damages from Corner's negligent left turn.  The court has already detailed his physical injuries, pain and suffering, and medical expenses.

Rodriguez seeks $444,871.31 in damages:  $144,871.31 in special damages ($98,229.07 in past medical expenses, and $46,642.24 for future care) and $300,000 in general damages. *See* Pl.'s Proposed FOF & COL, ECF No. 81, PageID # 703.  Corner does not contest any element of the damage amount or the damage total.

**E.   Comparative Negligence.**

Corner raises comparative negligence as an affirmative defense.  Def.'s Proposed FOF & COL, ECF No. 80, PageID # 651-52.

"Prior to the legislative enactment of comparative negligence," Hawai'i courts applied the common law "rule of contributory negligence, and an injured plaintiff was denied recovery upon a showing that her negligence contributed to her own injury." *Steigman v. Outrigger Enters., Inc.*, 126 Hawai'i 133, 135, 267 P.3d 1238, 1240 (2011). Then, in 1969, the Hawai'i legislature passed a modified comparative negligence statute, because of a "legislative perception of unfairness in the common law doctrine of contributory negligence." *Wong v. Hawaiian Scenic Tours, Ltd.*, 64 Haw. 401, 403-04, 642 P.2d 930, 932 (1982).

The comparative negligence statute states:

> Contributory negligence shall not bar recovery in any action by any person . . . to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person . . . against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.

HRS § 663-31(a). The modified comparative negligence statute "eliminates contributory negligence, and instead provides that an injured plaintiff may recover against a defendant even if [their] negligence contributed to her own injury, as long as her negligence is not greater than that of the defendant." *Steigman*, 126 Hawai'i at 135, 267 P.3d at 1240.

Comparative negligence is an affirmative defense in tort actions. "Generally, the defendant has the burden of proof on all affirmative defenses, which includes the burden of proving facts which are essential to the asserted defense." *U.S. Bank Nat'l Ass'n v. Castro*, 131 Hawai'i 28, 41, 313 P.3d 717, 730 (2013).

Corner alleges that Rodriguez's "claim is barred" under the comparative negligence statute because "his fall from his motorcycle was due to his excessive speed and misjudgment when applying his breaks [sic] which was greater than any alleged negligence of [the] Defendant." Def.'s Proposed FOF & COL, ECF No. 80, PageID # 652. Other than this catch-all statement, Corner does little to prove the elements of his affirmative defense. *See id.* The court nevertheless addresses each element. *See Cho v. Hawai'i*, 115 Hawai'i 373, 379 n.11, 168 P.3d 17, 23 n.11 (2007) (setting forth the elements of a negligence claim: duty, breach, causation, and damages).

### 1. Duty.

As discussed earlier, a duty may be established by statute. *Lee v. Corregedore*, 83 Hawai'i 154, 172, 925 P.2d 324, 342 (1996). HRS § 291C-102(a) prohibits driving a vehicle "at a speed greater than the maximum speed limit" posted on an

"official sign."[7]  As part of the state's traffic code,
violations of HRS § 291C-102(a) constitute traffic infractions
that could incur civil liability under HRS § 291D-3.  HRS
§ 291C-62 therefore establishes a duty of care.

### 2.  Breach.

The speed limit on Lusitana Street is 25 miles per
hour.  Pl.'s Decl., ECF No. 74, PageID # 433.  Rodriguez
testified at trial that he drove 25 miles per hour on Lusitana
Street before the accident.  *Id.* However, reports from EMS, the
emergency department, and the orthopedic surgery department
documented his earlier statement that he was traveling
approximately 40 miles per hour before the accident.  Joint Ex.
2 at 3 (emergency department report); Joint Ex. 3 at 4
(orthopedic surgery notes); Joint Ex. 27 at 2 (EMS report).
Those reports reflect Rodriguez's statement shortly after the
accident.

Rodriguez's expert Wayne Slagle testified that the
speed at which Rodriguez traveled "cannot be determined."
Slagle Decl., ECF No. 64, PageID # 314.  Similarly, Corner's

---

[7]  The court does not address "excessive speeding" under the
petty misdemeanor statute in HRS § 291C-105.  HRS § 291C-
105(a)(1) defines "excessive speeding" as driving 30 miles per
hour or more over the posted speed limit.  Corner does not
allege that Rodriguez violated HRS § 291C-105 or that his speed
equaled or exceeded 55 miles per hour.  There is no evidence in
the record suggesting such a speed.

expert Brad Wong testified that the "physical evidence is inconclusive" as to whether Rodriguez was traveling "25 mph or 40 mph (or somewhere in between)." Wong Decl., ECF No. 67-1, PageID # 364.

The more credible evidence (because closer in time to the accident and not in a litigation context) is that Rodriguez was driving up to 15 miles per hour over the posted speed limit, thus breaching his duty to stay within the speed limit posted on Lusitana Street.

### 3. Causation.

Under the *Mitchell* test, Corner must prove that Rodriguez's speed was a "substantial factor" in bringing about the accident and that there is "no rule of law" relieving Rodriguez from liability because of the manner in which his negligence resulted in his injuries. *See Kahoʻohanohano*, 117 Hawaiʻi at 305, 178 P.3d at 581 (quoting *Taylor-Rice*, 91 Hawaiʻi at 75, 979 P.2d at 1100).

Rodriguez's speed appears to have played a role in his inability to brake safely in time to avoid the accident. Corner's expert Brad Wong testified that if Rodriguez was traveling 25 miles per hour and if reaction time is taken into account, he would have needed approximately 66.4 to 84.7 feet to brake and stop his motorbike. According to Wong, if Rodriguez was traveling at 40 miles per hour, that distance would have

increased to 134.9 to 164.8 feet.  Wong Decl., ECF No. 67-1,
PageID # 365.  Rodriguez provided no evidence to counter Wong's
opinion that speed affected Rodriguez's ability to brake in
time.  The court concludes that Corner meets his burden of
showing that Rodriguez's speed was a substantial factor in his
inability to brake safely, which contributed to the accident.

### 4.   Damages.

As discussed earlier in this order, Rodriguez has
established his damages.  He seeks $444,871.31 in damages:
$144,871.31 in special damages ($98,229.07 in past medical
expenses, and $46,642.24 for future care) and $300,000 in
general damages.  *See* Pl.'s Proposed FOF & COL, ECF No. 81,
PageID # 703.

In apportioning fault between Rodriguez and Corner,
the court concludes that Corner bears 60 percent of fault and
Rodriguez bears the remaining 40 percent.  In this court's view,
Corner's sudden turn when close to Rodriguez's motorbike was the
primary cause of the accident, but not the sole cause.
Rodriguez's damages are reduced by 40 percent.

## V.   CONCLUSION.

Based on the above findings and conclusions, this
court rules that Corner is liable for 60 percent of Rodriguez's
damages.  The Clerk of the Court is directed to enter judgment
of $266,922.79 in favor of Rodriguez and to close this file.

IT IS SO ORDERED.

DATED:     Honolulu, Hawai'i, January 19, 2023.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*Rodriguez v. Corner*, Civ. No. 22-00299 SOM-KJM; POST-TRIAL FINGINGS OF FACT AND
CONCLUSIONS OF LAW;ORDER DIRECTING JUDGMENT IN FAVOR OF PLAINTIFF